[Civ. No. 15785. Second Dist., Div. One. Nov. 10, 1947.]

BEATRICE JENSEN, Appellant, v. DR. THOMAS H. LEONARD et al., Respondents.

Hector P. Baida and J. Leroy Irwin for Appellant.

Alfred E. Cate and Russell K. Lambeau for Respondents.

WHITE, J.—Plaintiff instituted this action to recover damages against defendants for allegedly maliciously and without probable cause, filing in the Superior Court of Los Angeles County a verified petition that she was mentally ill and in need of supervision, care or treatment (Welf. & Inst. Code, §§ 5040, 5047). That pursuant to said petition a warrant was issued for the apprehension and detention of plaintiff in the psychopathic ward of the Los Angeles General Hospital. The complaint further alleges that following such detention

for several days in the psychopathic ward, plaintiff was brought before the superior court, where after proceedings had in accordance with the law, "Judgment was rendered therein declaring that plaintiff was not insane and was not so far disordered in mind as to endanger the health, person and/or property of herself or others" (Welf. & Inst. Code, § 5040). That "said proceedings were thereupon terminated and the plaintiff discharged from custody."

By their answers, defendants denied that in procuring the issuance of process against plaintiff as aforesaid they were actuated by malice or acted without probable cause. Defendant Dr. Leonard also interposed two separate and affirmative defenses, in the first of which he alleged that plaintiff's complaint did not state facts sufficient to constitute a cause of action, and, secondly, that he is a physician-surgeon, licensed to practice his profession in the State of California, specializing in psychiatry and setting forth further facts upon which he based his claim that he "did each and every one of the things herein set forth in good faith . . . and having reasonable cause by reason of said facts and his examination of said plaintiff to believe that she was mentally ill and insane and that it was to the best interest of herself and the community that legal proceedings be instituted."

The cause proceeded to trial before a jury and at the conclusion of plaintiff's case, a motion for a nonsuit was granted as to defendant Dr. Leonard and denied as to defendant Mantle Hood. After both sides had rested the court directed a verdict in favor of defendant Hood. Plaintiff appeals from the judgment entered upon the nonsuit granted as to defendant Dr. Leonard and also from the judgment entered upon the verdict directed by the court in favor of defendant Hood.

We deem it unnecessary to here set forth in detail the rules governing the power of a trial court in granting a motion for a nonsuit or to direct a verdict, as the same have been before the courts of this state on many occasions and are firmly established by a long and harmonious list of cases. Suffice it to say that these limitations include the denial to the court of the right to weigh the evidence and require that it must be viewed in the light most favorable to the party against whom the nonsuit or directed verdict is sought, and every legitimate inference or presumption that may legitimately be drawn from the evidence must be accepted by the court in favor of such party. It is only when on such a consideration of the evidence, the result is a determination that there is no evi-

dence of sufficient substantiality to support a verdict in favor of that party if one were given, that the aforesaid motions may properly be granted (*Gish* v. *Los Angeles Ry. Corp.,* 13 Cal.2d 570, 573 [90 P.2d 792]; *Newson* v. *Hawley,* 205 Cal. 188, 190 [270 P. 364]; *Wiswell* v. *Shinners,* 47 Cal.App.2d 156, 159, 163 [117 P.2d 677]; *Barty* v. *Collins,* 109 Cal.App. 94, 96 [292 P. 979]).

The question presented to us for decision is whether, on the facts we shall mention, the court should have granted a nonsuit as to one defendant and directed a verdict for the other.

The record reveals testimony that plaintiff was an unmarried woman, aged 39 years at the time of her detention. About 19 years prior thereto she came to live with respondent Mantle Hood, then aged 8 or 9 years, and his mother Claudia Hood, in Springfield, Illinois. Plaintiff continued to reside with them until 1938, when the Hoods came to California. With the exception of a visit with them in California during December, 1941, plaintiff remained in Illinois until August, 1942, when she came to Santa Monica, California, to reside permanently.

Plaintiff had been employed in the auditor's office of the State of Illinois for 12 years prior to coming to California. Shortly after her arrival in this state she obtained employment at North American Aviation Company, which employment continued until November 4, 1943, about a week prior to her detention on the aforesaid charges of being mentally ill and in need of supervision, care or treatment.

In April, 1941, defendant Hood and his mother purchased an unimproved lot in the city of Santa Monica, California, and caused to be erected thereon an apartment house. At that time the Hoods wrote plaintiff concerning her obtaining an interest in the Santa Monica property. She then held a mortgage in the sum of $1,000 against defendant Hood's Springfield property. The Hoods were having "a great deal of financial trouble, having no rents coming in," while financing the apartment house project. During her residence in Illinois plaintiff had forwarded some $4,500 or $5,000 to the Hoods as payment for a one-fourth interest in the property.

Plaintiff became apprehensive and considerably perturbed about the money she had invested with the Hoods, and between January and August, 1943, consulted a firm of attorneys at Santa Monica concerning her interest in the property; was advised by them that in addition to the deed she possessed,

she should obtain a bill of sale to a one-fourth interest in the furniture and that she and the Hoods should enter into a definite agreement relating to the joint management of the apartment house and that a proper accounting of its receipts and expenditures should be had. Up to the time of plaintiff's arrest no apartment house income was either paid her or accounted for by the Hoods. Subsequent to her arrest, plaintiff brought an action for partition of said property and for an accounting of the income.

In September, 1943, Mrs. Hood left for a vacation and remained away until after appellant's detention in the psychopathic ward. Before going she had promised to execute the bill of sale, place the management of the house on a business-like basis and follow other suggestions made by plaintiff's attorney. According to plaintiff's testimony, none of these promises had been fulfilled before Mrs. Hood's departure on vacation.

Defendant Hood remained at the apartment until the Sunday immediately prior to November 12, 1943. On that Sunday plaintiff was crying and defendant Hood asked the reason for it. She replied that his mother had gone away without giving her the bill of sale and further that it appeared to her that she was not likely to get it. To this defendant Hood replied, ''Surely, you don't think mother and I would gyp you?'', whereupon plaintiff said, ''Well, I'm beginning to wonder. . . .''

On November 11, 1943, defendant Dr. Thomas A. Leonard whose services had been engaged by defendant Hood and for which Hood paid $30 or $35, called at plaintiff's apartment and stated he was a representative of the firm of attorneys whom plaintiff had consulted. With reference to defendant Dr. Leonard's visit, plaintiff testified: ''He said, 'Miss Jensen . . . can I talk to you for a few minutes? You have been to Mr. Taft (plaintiff's attorney) in regard to getting title insurance and a bill of sale. Do you know when they will do that?' Then he asked my age and if my father was alive. I said that had nothing to do with title insurance and bill of sale; I don't think you are what you are supposed to be, you get out of here. I opened the door. He continued to write in his book. I reached over and snatched the page out of the book. I picked up a stool and he backed out of the apartment.''

At the trial, plaintiff produced several witnesses including tenants of the apartment house, fellow employees and other

acquaintances who testified that at or about the time of her arrest they "noticed nothing unusual about her conversation, dress or actions," that "there was nothing abnormal about plaintiff's conversation or actions." That plaintiff "was a normal, well-balanced person. That she seemed worried about her interest in the property not being properly protected and that she was going to see a lawyer." A witness who was in charge of the department at North American Aviation in which plaintiff worked, testified that for some 14 months prior to the time she left such employment, about a week before her detention, "he would see her at least once a day; that plaintiff's work was excellent; that in his opinion she was a normal person." Another witness and mutual friend of plaintiff, testified that she had known plaintiff for some three years and that the latter "was absolutely of sound mind and seemed to be perfectly normal."

Defendant Dr. Leonard, called by plaintiff as a witness under section 2055 of the Code of Civil Procedure, testified that he filed the petition under section 5047 of the Welfare and Institutions Code, pursuant to which plaintiff was detained in the psychopathic ward as a person who was "mentally ill and in need of supervision, care or treatment." That he was a physician-surgeon specializing since 1912 in nervous and mental diseases; that he was licensed to practice his profession in California since 1930. That he came to California to serve as superintendent of the Pacific Colony at Spadra, a mental institution; in 1931, he became county psychiatrist for the County Charities of Los Angeles and served in that capacity for 12 years, at which time he entered private practice, specializing in neurological and psychiatric work exclusively. He holds a certificate from the California Department of Institutions appointing him as medical examiner in cases of alleged insanity. That under that certificate he has filed petitions such as the one in the instant case in many proceedings, the number thereof averaging from 35 to 60 per month since 1939. That he had never seen the plaintiff or his codefendant Hood until the Tuesday preceding November 11, 1943. That his codefendant Hood was referred to him by the Los Angeles County Psychiatric Department. When the defendant Dr. Leonard first talked to defendant Hood the latter furnished him a case history to the effect that he had known plaintiff herein since he was a boy of 8 or 9 years; she had lived in his family until he had moved to California; that plaintiff herein had acquired by purchase an interest in the

aforesaid apartment building at Santa Monica; that on many occasions while she was in the home of defendant Hood plaintiff had moody spells when she would become melancholy; about six weeks prior to this conversation, plaintiff had told defendant Hood that people were following her about and that she believed defendant Hood "was the cause of it all." Defendant Hood advised defendant Dr. Leonard that he had moved out of the apartment next to plaintiff. That defendant Hood had gone north on a vacation and on his return plaintiff appeared to be considerably disturbed, that he became alarmed and asked her to see a psychiatrist which she refused to do. That defendant Hood advised the witness that he consulted the Los Angeles Psychopathic Department, after which he contacted defendant Dr. Leonard. Defendant Hood also told defendant Dr. Leonard that Mrs. Manuel, one of the tenants in the apartment house, had been called on the phone about 12:30 o'clock in the morning by plaintiff who complained that a "Mr. Bob" was being kept locked up in the garage of the apartment house. Defendant Hood stated to Dr. Leonard that he was afraid of plaintiff; that her attorneys had told her that her title to the Santa Monica property was satisfactory, but that plaintiff continued to ask defendant Hood "when this game of hide and seek was going to stop," and had further charged him with letting "Mr. Bob in by way of a bedroom window."

On November 11, 1943, following his conversation with defendant Hood and after interviewing Mrs. Manuel, defendant Dr. Leonard called at plaintiff's living quarters and was admitted by her. He talked with her some 45 minutes. That as the interview was drawing to a close he began writing in a notebook, information supplied him by the plaintiff, whereupon she grabbed the leaves of the notebook and tore them up. Then she picked up a metal stool and raised it over her head as though to strike him, whereupon he grabbed the stool, put it down on the floor and left the apartment.

Upon the foregoing facts, defendant Dr. Leonard diagnosed plaintiff's condition as a form of dementia praecox and concluded that she was dangerous. Thereupon he filed the foregoing petition. That for the professional services rendered by him he received $30 or $35 from his codefendant.

During the testimony of this witness there was introduced into evidence, without objection, the file in case numbered 76474, entitled, "The People of the State of California, for the best interest and protection of Beatrix Jensen, as a men-

tally ill person.'' This file contained the petition filed by defendant Dr. Leonard pursuant to section 5047 of the Welfare and Institutions Code; the certificate of the two medical examiners at the psychopathic ward, one of whom was a member of the Lunacy Commission of Los Angeles County, and the other, Chief Psychiatrist at the Los Angeles General Hospital, who therein certified to the court in the psychopathic hearing that they had examined plaintiff herein on November 13, 1943, and with reference to her ''General Physical Condition and Present Mental Status,'' stated, ''Says she seems to be having hallucinations and has since last Saturday night. I keep thinking there is someone being chased off the place by a friend of mine. They say there's no such person. Says she had no transportation to work so she didn't go. Says she was under the impression that Mr. Hood was at the bottom of a conspiracy. Someone came up to her at the beach and talked to her and she made something out of it. She heard them order Bob off the place. She freely reveals her mental content in examination and gives a fairly good account of herself.'' With reference to their ''tentative diagnosis'' of plaintiff herein, said medical examiners certified that such diagnosis was ''Dementia Precox, Paranoid type.'' The court file also contained a ''Psychopathic Department Social Report,'' signed by G. Dodge, Chief Psychopathic Probation Officer of Los Angeles County, which, among other things, stated that in an interview with plaintiff herein at the psychopathic ward, the latter stated that ''She states that she has noticed for the past two months, at work, that there have been notes passed, implications in the conversation, and laughter at times directly apparently towards her, which she believes was due to the belief that she was in love with her boss. She is of the opinion that Mr. Hood told this at the plant, although she has no verification. She believes she has been followed and watched. . . . She is not too convinced that her ideas are correct; believes that she may have let her imagination control her, but realizes that she needs rest and possible care.'' The recommendation of the chief psychopathic probation officer was, ''Believe patient would be benefited by a period of sanitarium care.''

The foregoing presents the state of the record at the conclusion of plaintiff's case in the instant proceeding, at which time the motion for a nonsuit was granted as to defendant Dr. Leonard and denied as to defendant Hood.

During the presentation of his defense by defendant Hood there was introduced into evidence by stipulation the reporter's transcript of proceedings had at the psychopathic hearing before the superior court, from which it appears that on November 17, 1943, pursuant to the foregoing petition filed by defendant Dr. Leonard, the matter came on for hearing in department 16 of said court, at which time the aforesaid medical examiners and the chief psychopathic probation officer testified to the facts contained in the foregoing medical certificate and psychopathic department social report. Thereupon the attorney appearing for plaintiff herein at the psychopathic hearing addressed the court, stating that the plaintiff desired ''to have this matter dismissed and go voluntarily to some rest home and have care and treatment, . . . she has the insight to recognize that she has something that ought to be taken care of. . . . I have talked to these folks who are her employers and people who worked with her, and while they recognize she has some thoughts that possibly are not so, it seems to me the recognition of that would entitle her to the chance to go voluntarily and if she did not, she could be brought here again and I do feel either the matter should be off calendar or that she, upon her promise to take this treatment—that certainly is satisfactory to Mr. Hood, I think, with whom I talked.''

After some discussion participated in by the court, the medical examiners and the chief psychopathic probation officer concerning the advisability of plaintiff going to Rest Haven Sanitarium, her attorney again addressed the court, saying, ''In other words, I would like her to promise the judge that she would go and do this.'' Her counsel then asked plaintiff herein, ''Do you want to do that and will you do that?'' to which she responded, ''Yes.'' Thereupon the court stated, ''All right, Miss Jensen, I think we will do it that way, we will dismiss the case and you go out with the understanding that you are going to Rest Haven and remain there until you get well. The case will be dismissed with that understanding.''

There was testimony that thereafter plaintiff herein did go to Rest Haven Sanitarium, did take treatments and remained there from November 17, 1943, to January 7, 1944. That on March 25, 1945, plaintiff herein sought the professional services of Dr. Thomas J. Cummins, a psychiatrist, visiting him on five occasions, spending an hour and a half on each occasion. This physician testified that she was then suffer-

ing from psycho-neurosis, "that is, it is a psycho-neurosis which is characteristic, or, so far as she is concerned, social adjustment. She is fully aware of environment and conditions which she has explained to myself."

Without repeating evidence hereinbefore narrated, the testimony of defendant Hood may be summarized by saying that about May, 1943, he first noticed that plaintiff herein was not careful of her personal appearance, was excitable and would cry without provocation; that "her hair was not well kept, as it has been before, and she was not as well dressed as in the past when she came out here on a vacation." That on one occasion when the witness spoke of a girl with whom he was keeping company, plaintiff herein said, "If you bring that girl back here again I will kill her."

Defendant Hood testified that there had been discussions between his mother, plaintiff and himself concerning the management of the apartment house property, the financial difficulties in connection therewith, and the need of securing additional funds through the medium of a second mortgage on the property "in order to carry it." That the apartment house was opened in February, 1942, and plaintiff arrived in California about August of that year. That plaintiff herein was "very unsatisfied about the whole thing," and was "in a high state of excitement about the building." That about September 12, 1943, plaintiff herein accused defendant Hood of plotting against her and some two or three days later when making a similar accusation, warned him that he "should be careful." A few days later and on a subsequent occasion plaintiff herein accused defendant Hood of having her "shadowed." She again warned him to be careful or he would be sorry. Defendant Hood testified that these accusations were unfounded and he suggested that plaintiff should see a psychiatrist, to which she replied that " if anyone needed a psychiatrist, I did." Defendant Hood then testified concerning his meeting with his codefendant Dr. Leonard and corroborated the doctor's testimony with reference to what he related to the doctor. Defendant Hood testified that he met Dr. Leonard after he had called on Mrs. Dodge, chief psychopathic probation officer, who recommended defendant Hood to Mr. Gormley, clerk of the Psychopathic Department of the Superior Court who in turn referred defendant Hood to Dr. Leonard. Defendant Hood did not recall saying anything to his codefendant Dr. Leonard about filing a petition in reference to plaintiff herein.

350

Defendant Hood's mother, Mrs. Claudia M. Hood, testified with reference to the financial dealings had between plaintiff herein, herself and her son. That prior to leaving on her vacation about September 7 or 9, 1943, she noticed plaintiff's "unusual conduct." This witness also testified that on an occasion when she was talking with plaintiff herein about defendant Hood bringing a lady friend of his to the house, plaintiff said, "Well, he better not bring that ———; I won't repeat what she said—bring her here again, or I will kill her." This witness also testified as to an occasion when plaintiff herein picked up an ashtray and "started to throw it at my son and myself." The witness conceded that there was considerable discussion with plaintiff herein concerning the latter's investment in the apartment house project.

In addition to the testimony hereinbefore narrated as given by plaintiff, she testified that insofar as her meeting a man at the beach was concerned, she simply told defendant Hood that a man had approached her and asked for a match but that she did not tell defendant Hood that she was being followed, nor did she tell him that people at the plant where she worked were laughing at her, or that they looked at her when she was walking by. She denied saying anything uncomplimentary about defendant Hood's lady friend and further denied that she had at any time threatened to kill her, stating that all she said was that "I did not want to be nice to her around the house; that he should take her out once in awhile instead of bringing her to the house every Sunday, my day of rest." Plaintiff further testified that she had stated to defendant Hood that she did not approve of the way he was managing the place, that she was never informed what the income was, what the outgo was, and never received any money from her investment in the apartment house project. With reference to her meeting with defendant Dr. Leonard, plaintiff testified that he told her he was a representative of the law firm of Tanner, Odell and Taft and asked if he could talk with her for a few moments. After some conversation with reference to her dealings with defendant Hood and his mother concerning the apartment house deal, she testified that defendant Dr. Leonard asked her what was her age and if her father was alive, to which she said, "that had nothing to do with title insurance or a bill of sale; I don't think you are what you are supposed to be, you get out of here. I opened the door. He continued to write in his book. I reached over and snatched the page out of the book. I picked up a stool

and he backed out of the apartment." In her testimony plaintiff denied that she told either defendant Hood or defendant Dr. Leonard that she heard voices but that she did tell defendant Hood that she heard someone in the garage. With reference to her conversation with Mrs. Manuel, one of the tenants in the apartment house, plaintiff testified she told her, "I thought I heard someone prowling around the garage. We were not on very good terms and the conversation wasn't very long."

The primary question to be considered in an action for malicious prosecution is the want of probable cause for the prosecution complained of (*Grant* v. *Moore*, 29 Cal. 644, 648; *Bealmear* v. *Southern California Edison Co.*, 22 Cal.2d 337, 340 [139 P.2d 20]). ■ While malice may be inferred from the want of probable cause, want of probable cause may not be implied from the most express malice. ■ Insofar as it is applicable to the law of malicious prosecution, the term "probable cause" has been defined to be a suspicion founded upon circumstances sufficiently strong to warrant a reasonable person in the belief that the charge is true (*Haydel* v. *Morton*, 8 Cal.App.2d 730 [48 P.2d 709]; *Richter* v. *Neilson*, 11 Cal.App.2d 503 [54 P.2d 54]; *Johnson* v. *Southern Pacific Co.*, 157 Cal. 333 [107 P. 611]; *Lee* v. *Levison*, 173 Cal. 166 [159 P. 438]; *Selvester* v. *Kennedy*, 137 Cal.App. 250 [30 P.2d 63], and cases therein cited). ■ Nor is the existence of probable cause negatived by merely showing that the accused was successful at the trial of the proceedings in securing an exoneration. Not even a conflict on the issue of probable cause is created by such favorable termination of the prosecution which gave rise to the malicious prosecution action (*Haydel* v. *Morton, supra; Dunlap* v. *New Zealand F. & M. Ins. Co.*, 109 Cal. 365 [42 P. 29]; *Moore* v. *Durrer*, 127 Cal. App. 759 [16 P.2d 676]; *McKenna* v. *Heinlen*, 128 Cal. 97 [60 P. 668]).

We shall first give consideration to the motion for a nonsuit which was granted as to respondent Dr. Leonard. ■ The burden of proving malice and want of probable cause in an action for malicious prosecution rests upon the plaintiff. ■ And like any other fact in issue, malice may be proved by direct evidence, or may be inferred from all the circumstances of the case. ■ While malice is not presumed as a result of the want of probable cause, yet lack of probable cause is a circumstance from which malice may be inferred. ■ In the case at bar there was no direct evidence of malice

on the part of respondent Dr. Leonard. Malice, if any, must therefore be inferred from a lack of probable cause or from other circumstances of the various conversations and acts of the parties surrounding the filing of the petition against appellant. The measure of the knowledge of the prosecutor must be applied as of the time that the proceeding was instituted under section 5047 of the Welfare and Institutions Code, which in the case now before us was November 12, 1943. There is also a further requirement to be considered, and that is whether the prosecutor, at the time he verified the foregoing petition, actually believed appellant "to be mentally ill and in need of supervision, care or treatment" (Welf. & Inst. Code, §§ 5040, 5047).

We fail to find in the record before us sufficient evidence to have justified the jury in finding, had the question been submitted to it, that respondent Dr. Leonard did not in fact believe that appellant was "mentally ill," as that term is defined by section 5040 of the Welfare and Institutions Code. Therefore, the question of his belief was properly determined by the court on the basis of what, under the circumstances, was sufficient to cause a reasonable person to entertain a suspicion of the mental illness of appellant. The burden was cast upon appellant of proving the negative fact of want of probable cause and the existence of malice. The facts upon which respondent Dr. Leonard relied are hereinbefore set forth. True, appellant offered evidence that she was not mentally ill on or before November 12, 1943, and denied statements attributed to her by respondent Hood. But the question before the court was not whether appellant was in fact mentally ill at the time of her detention, but whether or not Dr. Leonard had probable cause to believe that appellant was mentally ill at the time he verified the petition which resulted in her detention, as that term is understood by judges and the legal profession (*Jones* v. *Jones,* 71 Cal. 89, 91 [11 P. 817] ; *Good* v. *French,* 115 Mass. 201). Appellant's denial of the truth of statements made by respondent Hood to respondent Dr. Leonard did not create any conflict in the testimony that the latter had such statements before him at the time he interviewed appellant, and that he honestly believed that such statements as to appellant's condition were confirmed by her conduct toward him at the time he personally talked with her. We are, therefore, convinced that in the record before us there is an abundance of evidence, without substantial conflict, to justify a reasonable person, situated as respondent

Dr. Leonard was, in assuming there was probable cause to believe that appellant was mentally ill. Such being the case, it was for the trial court to determine, as a matter of law, whether an inference of probable cause was warranted and whether respondent Dr. Leonard did or did not in fact believe that appellant was mentally ill. The action of the trial court in granting a nonsuit as to respondent Dr. Leonard must therefore, under familiar rules, be upheld because if a verdict for appellant had been found against respondent Dr. Leonard on the state of the record here presented, such verdict would have had no support in the evidence and consequently would have been against law.

Appellant's contention that the disposition of the proceedings instituted against her creates a conflict in the evidence regarding the existence of probable cause is unavailing because, as heretofore pointed out, even though it be conceded that the proceeding was dismissed and the appellant discharged at the psychopathic hearing, a conclusion which under the record here present is extremely dubious, nevertheless the law is well settled that "[P]robable cause does not depend upon the possession of facts which satisfactorily prove the guilt of an accused person. It is adequate proof of the existence of probable cause that one is possessed of information or facts which are sufficient to cause a reasonable person to honestly believe the charge is true." (*Moore* v. *Durrer, supra,* p. 765, and cases therein cited.)

■ Coming now to a consideration of the directed verdict granted as to respondent Hood, we are confronted with a situation where the case had proceeded beyond the point of a nonsuit and presumably, therefore, appellant had made out a prima facie case. Respondent Hood was sworn and testified as a witness for appellant in her case in chief. In so doing he testified to statements made and conduct on the part of appellant which generated his belief that she was mentally ill. Other witnesses testified, as hereinbefore narrated, as to the mental illness of appellant. The record of the psychopathic proceeding was also received in evidence. Appellant, however, denied the truth of respondent Hood's testimony concerning her conversations with and actions toward him. Nevertheless, we are persuaded that such denials cannot, in the face of the overwhelming evidence, both oral and documentary, to the contrary, be held to constitute proof of that *substantial* character required to justify the

submission of a question of fact to the jury (*Estate of Bryson,* 191 Cal. 521, 541 [217 P. 525]). As was said by this court in *Neblett* v. *Elliott,* 46 Cal.App.2d 294, 305, 306 [115 P.2d 872] (hearing denied by the Supreme Court): "We are not unmindful of the fact that jurors are the sole judges of the facts, but the question as to whether there is *substantial* evidence in support of the plaintiff's case is in all instances a question of law for the court." We must not be understood as holding that the trial judge, when ruling upon a motion for a directed verdict, is entitled to pass upon the credibility of witnesses, but are merely holding that under the evidence in the record now engaging our attention, the negative testimony of appellant, given to sustain the burden imposed upon her of showing want of probable cause, "is so inherently improbable that it was not entitled to consideration as evidence in the case, and that, if a verdict for the plaintiff should have been founded on it, such verdict would have no support as being against the law." (*Neblett* v. *Elliott, supra,* p. 305.) Whatever may be said concerning appellant's testimony as to business differences between herself and respondent Hood on the question of malice, insofar as the primary question of probable cause is concerned, it must be held that her testimony is inherently improbable and does not amount to that *substantial* evidence required to create a conflict on the issue of probable cause. Had a verdict been rendered in favor of appellant herein against respondent Hood the trial court would have been compelled to set it aside as being without support in the evidence and therefore contrary to law. The motion for a directed verdict in favor of respondent Hood was, therefore, properly granted.

The judgments, and each of them, are therefore, affirmed.

York, P. J., and Doran, J., concurred.

A petition for a rehearing was denied November 28, 1947, and appellant's petition for a hearing by the Supreme Court was denied December 29, 1947.