[Civ. No. 13622. First Dist., Div. One. June 15, 1948.]

BERT BROCK, Appellant, v. SOUTHERN PACIFIC COMPANY (a Corporation) et al., Respondents.

Ernest E. Emmons, Jr., and Philander Brooks Beadle for Appellant.

Dunne & Dunne, Robert L. Lamb, Theodore Tamba and Alfred Del Carlo for Respondents.

WARD, J.—This is an action for malicious prosecution based upon a proceeding under Welfare and Institutions Code, sections 5000-5160 for the commitment of plaintiff as a mentally ill person. Plaintiff appeals (1) from the judgment entered on the verdict in favor of defendant Matthew A. Quinn (sued as Matt Quinn) and against plaintiff; (2) from the order granting the motions of the Board of Trustees of Leland Stanford Junior University (sued as Leland Stanford University, a corporation), and the Southern Pacific Company, a corporation, for judgment notwithstanding the verdict awarding plaintiff $50,000, and from the judgment entered pursuant thereto. The action was dismissed as to the city and county of San Francisco, a municipal corporation, Dr. C. A. Walker, Dr. Henry W. Newman, Dr. P. P. Poliak, Dr. L. M. Wilbur, Dr. Arthur Beardsley and 15 John Does.

Recognition is currently being given to the need for minimizing formal court procedure in working toward a change in public attitude as to proceedings for the commitment of the mentally ill from ''committed like a criminal'' to ''admitted like a patient.'' (*Analysis of Legal and Medical Considerations in Commitment of the Mentally Ill,* 56 Yale L.Jour. 1179, 1208 (1947); and see *Commitment of the Mentally Ill,* 24 Tex.L.Rev. 307 (1946). ██ At the same time it is generally recognized that 'One who initiates civil proceedings against another which allege the other's insanity . . . is liable for the harm to the other's reputation caused thereby, if (a) the proceedings are initiated (i) without probable cause, and (ii) primarily for a purpose other than that of securing the adjudication of the claim on which the proceedings are based, and (b) except where they are ex parte, the proceedings have terminated in favor of the person against whom they are brought.'' (Restatement, Torts, § 678; accord, 5 A.L.R. 1097; 145 A.L.R. 711.) The existence of a cause of action for malicious prosecution based upon a proceeding under Political Code, section 2168 was recognized by the Supreme Court in *Griswold* v. *Griswold* (1904), 143 Cal. 617 [77 P. 672], and *Franzen* v. *Shenk* (1943), 192 Cal. 572 [221 P. 932].

In keeping with a trend toward modernization of commitment legislation (*Analysis of Legal and Medical Considerations in Commitment of the Mentally Ill, supra*), the Legislature in 1937 enacted Welfare and Institutions Code, sections 5000-5160. Section 5155 of said code which was added in 1939

(Stats. 1939, ch. 295, § 34, p. 1566) provides that "This chapter shall be liberally construed so that, as far as possible and consistent with the rights of mentally ill persons and others, such mentally ill persons shall be treated, not as criminals, but as sick persons." Subsequent to these enactments, the appellate courts have on two occasions assumed the propriety of a malicious prosecution action based upon the filing of a petition under Welfare and Institutions Code, section 5047. (*Pulvermacher* v. *Los Angeles Co-ordinating Com.* (1943), 61 Cal.App.2d 704 [143 P.2d 974] ; *Jensen* v. *Leonard* (1947), 82 Cal.App.2d 340 [186 P.2d 206].)

The following "Statement of Facts" appears in appellant's opening brief: "Plaintiff was employed by respondent Southern Pacific Company as a carpenter for a number of years prior to 1939. On September 14, 1939, he was admitted to the Southern Pacific Company's General Hospital at San Francisco as an employee-patient, his complaints being for injuries sustained while at work. While in the hospital he was given a spinal puncture by a student doctor. He was there under the care of Dr. C. A. Walker and Dr. Arthur Beardsley relative to his injuries. At various times during his stay in the hospital plaintiff was urged to 'enter a state institution,' 'go to your family' or 'go to a farm.' Plaintiff refused to do so, stating that, since Southern Pacific Company had injured him, the railroad should supply him with medical care.

"During the latter part of his stay in the Southern Pacific Hospital plaintiff was threatened by Dr. Beardsley, who told him that if he did not leave the hospital voluntarily, he would see to it that plaintiff would be placed in a mental institution. Dr. Walker wrote on October 14, 1939, to Elmer Brock, plaintiff's brother, requesting that appellant be committed to a state institution and asking plaintiff's brother to take steps to remove the patient from the Southern Pacific Company Hospital. Dr. Walker also requested authority to proceed with plaintiff's commitment to a state institution. This letter was followed by a telegram from Dr. Walker stating 'your brother should be transferred at once to a State Institution.' Plaintiff was discharged from the Southern Pacific Hospital on March 23, 1940, but did not leave until March 26th. On that day he was ordered out. Plaintiff was still in a sick and disabled condition at that time.

"Upon his release, plaintiff became a patient of Dr. Andrew B. Stockton, who diagnosed his principal ailment as a severe

case of arthritis of the back. Plaintiff was a patient of Dr. Stockton at the time of his attempted commitment hereinafter mentioned. Dr. Stockton did not find plaintiff to be mentally ill. He advised plaintiff to go to the Stanford Hospital for clinic treatment of his back.

"On July 14, 1940, plaintiff entered the San Francisco Hospital. During his stay there he contracted typhoid fever and remained until August 27, 1940.

"Upon his release from the San Francisco Hospital plaintiff retained counsel, who, on September 25, 1940, filed an action for malpractice arising out of the spinal puncture which had been administered to him at the Southern Pacific Company Hospital. On August 30, 1941, plaintiff filed an action under the Federal Employers' Liability Act, [35 Stats. 65] 45 U.S.C.A. 51 et seq., and based upon the injuries sustained in September, 1939. Defendant Southern Pacific Company was named as a defendant in both actions. These two suits were pending on September 18, 1941.

"Plaintiff first reported to Stanford Hospital on July 1, 1941. From that date until August 28, 1941, he was seen in the Stanford Hospital as an out-patient about ten times. During this period he was not advised that he was under mental observation, but was under the impression that he was receiving treatment for his arthritic condition. While under treatment at Stanford Hospital, plaintiff was requested to, and did, sign 'permission' slips authorizing former hospitals and doctors to reveal his past medical history to the Stanford Hospital. Pursuant to such authorization a letter was obtained from the Southern Pacific Company Hospital dated August 6, 1941 over the signature of Dr. C. A. Walker.

"On August 29, 1941, Dr. Henry Newman, chief of the Stanford Hospital Neuropsychiatric Clinic, wrote a letter on the letterhead of the Stanford Hospital to the district attorney's office, attention of defendant Matt Quinn, stating that plaintiff was suffering from somatic delusions, was 'a menace to himself and society,' and should be committed to a State Hospital as a mentally ill person. . . .

"Thereafter, on September 10, 1941, defendant Matt Quinn signed a petition alleging that plaintiff was so mentally ill that without supervision and care he constituted a menace to himself and the person and property of others. Quinn's conclusion to this effect was based upon the statement referred to

in Dr. Newman's letter of August 29, 1941. On September 18, 1941, plaintiff was arrested pursuant to a warrant based upon Quinn's petition and confined in the psychopathic ward in the San Francisco Hospital.

"Plaintiff held a patent on a process which he had perfected for manufacturing a synthetic petroleum fuel. While he was detained under the alleged insanity charge, defendants tried to force him to reveal information concerning the process. Defendants had acquired no rights in the patent, by purchase or otherwise, but threatened to continue prosecuting plaintiff unless he would divulge information concerning it.

"Dr. Beardsley, who had previously threatened plaintiff while a patient in the Southern Pacific Hospital, examined him at the San Francisco Hospital after the arrest. Dr. Beardsley then again threatened plaintiff, stating that he would see to it that plaintiff would be placed where he could not sue the Southern Pacific Company again. Dr. Beardsley also acted as one of the two medical examiners appointed by the Court to examine plaintiff and certify as to his mental condition. Dr. Beardsley, with Dr. Harold E. Fraser, thereafter joined in certifying to the Court that plaintiff was mentally ill. Plaintiff demanded a jury trial on the issue of his sanity. Dr. Beardsley appeared as a witness and testified that plaintiff was mentally ill. Dr. Stockton testified that he was not.

"The jury, on October 17, 1941, returned a verdict of not mentally ill and plaintiff was thereupon released from a confinement totaling 29 days."

The foregoing is supported largely by plaintiff's own testimony. The actions brought by plaintiff against the defendant Southern Pacific Company were determined in the latter's favor. (Defendants' Exhibits B and C, constituting the files in cases Nos. 304569 and 297642; *Brock* v. *Southern Pacific Co.*, 74 Cal.App.2d 806 [169 P.2d 402] ; see, also, *Brock* v. *Fouchy*, 76 Cal.App.2d 363 [172 P.2d 945].)

I. The Judgment in Favor of Defendant Matt Quinn.

The appeal from the judgment against plaintiff and in favor of Quinn is based entirely upon two claimed errors in instructions; one given and one refused. The instruction given informed the jury that the action was against Quinn in his official capacity through his appointment by the district attorney. The refused instruction was based upon the listed peace officers designated in Penal Code, section 817.

■ There is no merit to plaintiff's contention that the instruction stating that Matt Quinn was sued "in his official capacity through appointment by the District Attorney of the City and County of San Francisco" is not substantiated by the record. While it is true that the title to the second amended complaint upon which the matter went to trial names as a defendant, "Matt Quinn," the body of the said complaint states "That plaintiff is informed and believes and upon such information and belief, alleges that said defendant City and County of San Francisco, a municipal corporation, at all of the times herein mentioned employed defendant Matt Quinn in the capacity of investigator in the office of the District Attorney of said City and County of San Francisco." Furthermore his "Appointment and Oath" from both the present district attorney and his predecessor "appoint and constitute Matthew A. Quinn, Special Officer, in and for the City and County . . ."

Quinn offered evidence to support his contention that he was immune from this type of action for two reasons, namely, (1) he testified that he was a peace officer appointed by the chief of police of the city and county of San Francisco, and (2) documentary evidence supports his testimony that he was an investigator working for and on behalf of, and in the place of the district attorney, in the psychiatric division of the district attorney's office. Although the trial court instructed the jury that Quinn was sued in his official capacity through appointment by the district attorney, no instruction was given that he was thereby rendered immune. On the contrary, the jury was instructed as follows: "If, as to any defendant, the plaintiff has failed to prove any one of these elements by a preponderance of the evidence, that defendant is entitled to your verdict . . . as I have stated, the plaintiff has the burden of proving all the elements to which I have called your attention as if as . . . to either Southern Pacific Company or Stanford University or Matt Quinn there is no evidence showing as to it or him any necessary element of plaintiff's claim or even if there is some such evidence, if the plaintiff has failed to sustain the burden of proof by a preponderance of the evidence any one of the necessary elements of his case as to either of these defendants, it will be your duty to return your verdict in favor of said defendant . . . and if you find that Defendant Matt Quinn filed said petition in good faith exercised of his

190

own best judgment and with probable cause and without malice, you will bring in a verdict in favor of Defendant Matt Quinn." As was said in another action for malicious prosecution, "We must assume that this instruction was followed by the jury." (*Robinson* v. *McKnight,* 103 Cal.App. 718, 729 [284 P. 1056].)

█ The instruction which the trial court refused to give reads as follows: "You are instructed that a 'peace officer' under the laws of this State, 'is a sheriff of a county, marshall of a municipal court, constable of a township, marshal, policeman of a city or town.' If the evidence before you shows that the appointment of a policeman in the City and County of San Francisco must be made by the chief of police under the provisions of the charter of said City and County of San Francisco, and you further find that there is no evidence before you of the appointment of the defendant Matt Quinn as a policeman, special or otherwise, by the chief of police of said City and County of San Francisco, you must find that the defendant Matt Quinn was not a 'peace officer' within the meaning of the law of this State. If you so find, you are further instructed that the defendant Matt Quinn stands in the same position as a private citizen in this action and enjoys no immunity from civil liability." This instruction was properly refused in view of the fact that the trial court did not instruct the jury according to Quinn's theory that he was immune from this type of action. (*Timbrell* v. *Suburban Hospital, Inc.,* 4 Cal.2d 68, 72 [47 P.2d 737]; see cases cited, 24 Cal.Jur. pp. 804-805.)

II. The Judgments in Favor of Southern Pacific Company and the Board of Trustees of the Leland Stanford Junior University.

█ The motions for judgment notwithstanding the verdict were properly granted as to both Southern Pacific Company and the Board of Trustees of the Leland Stanford Junior University since "giving to plaintiff's evidence all the value to which it is legally entitled, indulging in every legitimate inference which may be drawn from that evidence, the result is a determination that there is no evidence of sufficient substantiality to support a verdict in favor of the plaintiff." (*Card* v. *Boms,* 210 Cal. 200, 202 [291 P. 190]; accord, *Brandenburg* v. *Pacific Gas & Elec. Co.,* 28 Cal.2d 282, 284 [169 P.2d 909], and see *Blank* v. *Coffin,* 20 Cal.2d 457 [126 P.2d 868], and *Hicks* v. *Reis,* 21 Cal.2d 654 [134 P.2d 788].)

The conclusion reached herein is in accord with the recent case of *Jensen* v. *Leonard, supra,* wherein the appellate court affirmed a judgment entered upon a nonsuit granted as to the physician who filed a petition under Welfare and Institutions Code, section 5047, and a judgment entered upon a directed verdict in favor of the codefendant who had referred the plaintiff to said physician.

The evidence which plaintiff contends establishes the essential elements of a cause of action for malicious prosecution against Southern Pacific Company will first be reviewed. Plaintiff testified that in October, 1939, while he was a patient in the Southern Pacific Hospital under the care of Dr. Beardsley and Dr. Walker, the former urged him to leave the Southern Pacific Hospital and "enter a state institution" or "go to his family" or "go to a farm" or "take care of myself"; when plaintiff replied that the Southern Pacific Company should supply his medical needs, Dr. Beardsley said "We will get you out of here, if you don't go we will get you out by some other method." Under the rule set forth in *Card* v. *Boms, supra,* it must be assumed that the statements attributed to Dr. Beardsley were actually made. Plaintiff's testimony is corroborated by a letter dated October 11, 1939, and a telegram dated November 1, 1939, sent by Dr. Walker to plaintiff's brother advising him that plaintiff needed mental treatment, and requesting him to take steps "towards his removal from our hospital, or either to a private mental institution or commitment to a California State Hospital, or give us authority to proceed with such commitment." Nearly two years passed before Quinn signed the petition under Welfare and Institutions Code, section 5047. Plaintiff produced no evidence that Dr. Beardsley's statements were communicated to anyone but Brock, nor that the letter and telegram were shown to anyone but his brother. "In order that a defendant may be held liable for the malicious prosecution of a lunacy proceeding, it must appear, of course, that he instituted, or instigated the institution of, the proceeding." (145 A.L.R. 713-714.) Plaintiff's own evidence indicates that the intention of Dr. Beardsley and Dr. Walker as revealed in said evidence was not carried out for plaintiff was permitted to remain at the Southern Pacific Hospital until nearly the end of March, 1940.

Some mention has been made of the "puncture of the spine" as indicating maliciousness, but it is admitted

that a suit for malpractice primarily based upon this incident resulted in a judgment against Brock. "'. . . a judgment or decree necessarily affirming the existence of any fact is conclusive upon the parties or their privies whenever the existence of that fact is again at issue between them. (*In re Clark's Estate,* 190 Cal. 354 [212 P. 622]; Freeman on Judgments, §§ 249, 253.)'" (*Elliott* v. *Bertsch,* 59 Cal.App.2d 543, 549 [139 P.2d 332].)

█ Plaintiff contends that Dr. Walker's letter dated August 6, 1941, pursuant to a request from the Stanford Hospital, following the signing of a "permission" slip by plaintiff authorizing Southern Pacific Hospital to reveal his past medical history to the Stanford Hospital, shows that Dr. Walker was actively instrumental in maliciously bringing about the proceeding under the Welfare and Institutions Code. It reads as follows: "Gentlemen: Mr. Brock, age 56, was in the Southern Pacific General Hospital from September 14, 1939 to March 26, 1940. He complained of loss of appetite and weakness, dating from February, 1939.

"On physical examination no abnormality was found. Gastro-intestinal series of X-rays taken on September 19, 1939, showed: The stomach is large, atonic, J shaped, with accentuated rugal markings; no filling defect seen in the stomach; the duodenal bulb is well outlined. The liver is slightly enlarged and somewhat dense. In the ¾ lateral view a peculiar opacity is visualized juxtaposed to the duodenal bulb. This, we are inclined to believe, represents a large diverticulum of the duodenum. There is a residue in the stomach at the end of the six hours. There is no residue in this diverticulum. There is evidence of colonic statis at forty-eight hours. There is normal visualization of the gallbladder. Conclusion: Delayed emptying time of the stomach, possibly due to a chronic gastritis: appearance of a diverticulum of the second portion of the duedenum.

| | *Quantity* | *Free HCL* | *T.A.* |
|---|---|---|---|
| Gastric Contents: 1 | 30 cc. | 0° | 4 |
| 2 | 60 cc. | 4° | 20 |
| 3 | 65 cc. | 8° | 12 |

Stool examinations were all negative for occult blood: The blood Wassermann & Kahn were negative. Spinal fluid. Wassermann negative: Cells, 2 L.; Globulin 0; T. T. 32; C. G. 00000/00000.

"X-rays of the teeth showed very marked alveolar absorption.

"X-rays of the lumbo-sacral and lower thoracic spine showed practically no evidence of hypertrophic osteoarthritis.

"Prostate and *siminal vesticles* were normal.

"Vision, right 20/20; left 20/20. Media clear. Fundi and discs normal. Ears, nose and throat negative.

"Diagnosis was made of advanced psychoneurosis with neurasthenic and schizoid trends.

"This man had definite somatic delusions, especially associated with the gastro-intestinal tract. He stated that several times he vomited ½ teaspoonful of blood, but this could not be substantiated at the hospital. He further stated that his intestines were leaking material into his abdominal cavity. He was subject at times to severe periods of depression, and on several occasions he would for no reason at all start crying, and request that a minister be called because he felt that he was dying. There is a mental conflict of some sort, but the patient refused to divulge its nature. The patient was very reclusive. He kept to himself, and said very little. There were never at any time any organic neurological signs.

"We trust that the foregoing information will be of service to you in the treatment of this case. Very truly yours /s C. A. WALKER  C. A. WALKER, M. D. Chief Surgeon."

Plaintiff's conclusion—that this letter contains a definite misstatement of a material fact relative to plaintiff's medical history in that it failed to make any reference to the "real reason" why plaintiff was a patient in the hospital or to his claim based upon alleged malpractice while there— is not supported by the record. Although plaintiff testified that prior to his entry into the Southern Pacific Hospital he had sustained an injury while in the employ of the Southern Pacific Company, the judgment against plaintiff is conclusive as to the absence of any cause of action against Southern Pacific Company therefor, and is consistent with Dr. Walker's statement that plaintiff's complaints upon entry were "loss of appetite and weakness." With respect to "the spinal puncture," the letter gives the results of various tests, and in this connection states: "Spinal Fluid. Wasserman negative; Cells, 2 L.; Globulin 0; T. T. 32; C. G. 00000/00000."

Dr. Beardsley was one of two doctors selected by the superior court to examine Brock after his apprehension. Plaintiff testified that during such examination Dr. Beardsley told

him that he would see to it that plaintiff would be placed where he could not sue the Southern Pacific Company again. Such statements were made subsequent to plaintiff's apprehension following the signing of the petition by Quinn. There is no evidence that Dr. Beardsley was acting as agent for the Southern Pacific Hospital when, in the capacity of a regular medical examiner appointed by the superior court, he saw and talked to the plaintiff. Such statements cannot serve as the basis for fastening any liability upon the Southern Pacific Company. (*Hobart* v. *Hobart Estate Co.*, 26 Cal.2d 412, 450-451 [159 P.2d 958]; Restatement, Agency, § 258.)

██ ██ One act or statement on the part of the Southern Pacific Company that may have had an effect on Dr. Newman in recommending plaintiff's detention is the statement in Dr. Walker's letter that Brock was afflicted with ''somatic delusions, especially associated with the gastro-intestinal tract.'' It is incumbent upon the party claiming to have been maliciously prosecuted to prove want of probable cause on the part of anyone alleged to have instigated the malicious prosecution. (*Singleton* v. *Singleton*, 68 Cal.App.2d 681 [157 P.2d 886].) The only witness called by plaintiff to testify as an expert was Dr. Andrew B. Stockton, who attended plaintiff in 1940 and 1941. Dr. Stockton, in reply to the question: ''Did it ever occur to you that he might have delusions or hallucinations?'' answered ''No.'' He further testified: ''Q. Did he have somewhat peculiar ideas as to what constituted his complaints? A. Yes, he did that. Q. Can you name any of those complaints that he thought he might have? A. Well, recently his complaints have been referable to the arthritis of the spine. Previous to that, he had, as I recall, dizziness, noises in his ears, he described curious abdominal symptoms, but it wasn't the symptoms so much as it was the idea he had of his own physiology that was peculiar. Q. I see. Did he bring you a list of things, to you, listing things for you to go over to see if you could tell him whether or not he was suffering from those things? A. He often did, yes. . . . He brought long lists at various times that included about every known medical disease, I imagine.'' There was a failure on the part of the plaintiff to prove that Dr. Walker did not have probable cause to make the statement quoted from his letter.

The principal evidence upon which plaintiff bases his cause of action against the Board of Trustees of the Leland Stan-

ford Junior University is the letter written by Dr. Newman to Quinn. It reads: "August 29, 1941. Mr. M. A. Quinn, District Attorney's Office. . . . Re: Bert Brock. . . . Mr. Brock was seen in medical clinic on July 22nd complaining of painful back, vomiting, etc. We obtained information from Southern Pacific Hospital that he had been hospitalized there from September 14, 1939 to March 26, 1940 complaining of loss of appetite and weakness. X-rays there showed evidence of a diverticulam of the second portion of the duodenum. They report that he had definite somatic delusions, and was subject to severe periods of depression.

"In medical clinic, he was uncooperative and refused to answer questions so was transferred to the nueropsychiatric clinic, as thorough medical workup was not practicable. In the neuropsychiatric clinic it was elicited that his complaints dated from 1939 when he was struck across the abdomen by a piece of timber. Neurological examination showed certain evidence of pyramidal tract involvement, but this was inconstant. It was almost impossible to obtain a coherent story from him; he was apparently very much deteriorated intellectually and very suspicious.

"In September of 1940, he was hospitalized in San Francisco Hospital with typhoid fever. Following his hospitalization in the isolation ward he was transferred to the psychiatric division, where a diagnosis of psychoneurosis was made. Laboratory examination, including blood, urine and blood Wassermann, were not remarkable. Bone and joint clinic found nothing remarkable.

"From our contact with the patient during repeated interviews, it is not entirely clear what exact diagnosis can be applied to Mr. Brock. We do feel, however, that he is definitely psychotic and that there is more than a suspicion that the psychosis is on the basis of organic disease of the central nervous system. It is impossible to adequately care for him in the psychiatric clinic and since he is a menace to himself and society, we feel that he should be committed to a State Hospital. Very truly yours Henry W. Newman, M.D. Neuropsychiatric Clinic."

In determining whether Dr. Newman had probable cause for the statements just quoted, the medical records upon which Dr. Newman based said statements must be considered. "In actions for the malicious prosecution of lunacy proceed-

ings probable cause has been in substance defined as such a state of facts as would lead a reasonably prudent man to believe that the plaintiff was insane. [Citing *Griswold* v. *Griswold, supra.*] Probable cause depends upon the facts known or available to the defendant at the time of making the accusation, and not upon the actual insanity of the plaintiff.'' (145 A.L.R. 716, accord *Jensen* v. *Leonard, supra.*)

■ When Mr. Brock presented himself at the Stanford Hospital clinic he produced the following statement: ''Started Sept. 1939 S P. Co. CC S 99 Traumatic injuries and resulting sickness. Can the spine be x-rayed and fixed up? Can I get medicines and electric diathermy treatments to get relief and possibly a cure of the painful destructive inflammations, progressing to total paralysis.

''Myositis. Parasynovitis. Panarthritis. Compound rotary curvature deformity of vertebrae column. Scoliosis, joint injuries, and crushing of the viscera. Aponeurosis. Lumbar girdle pains. Contusion compression of nerves. Inco-ordination. Constant nerves—muscular twitchings. Cramps. Atrophy of cells. Cartilage. Resilient Discs. Dysarthrosis. Neuroses. Dyspepsia. Salivary dysfunction. Dermatosis. Neurasthenia. Hyperesthesia. Necrosis. Hyperphidrosis. Amyothrophy. Damaged lympathic and kidney functions. Incontenance of bladder and intestinal Excretions. Osteomyelitis. Paresis. Polyneuritis. Lower legs and feet painful and in bad condition. Pachy and Lepto Meningitis.

''Cerebrospinal cirus. Paraplegia. Quiver and tremor of jaw and tongue. Teeth neuralgia. Insomnia. Congestive hyperaemia. Septicaemia.

''Cerebritis. Constant grusome sickening head achings. Occipital neuralgia. Constant sore paining eyes to blurry vision. Cortical paresis. Constant Scapalgia neck and cervical pains. The Puncture Job causes arthritis, disease, scoliosis, cortical bulbar spinal amyothrophic lateral sclerosis. Other injuries. Vomitings.

''The spinal nerves puncture and fluid drainage, etc. causes poisonings, chronic inflamations, pains, atrophy, sclerosis of brain, eyes and other matter. Leptomeningitis, paralysis, sickness. Injury to the neuroglia, fissures, 4th ventricles; Tissue membranes in head, and medulla Central cord Sympathetic—peripheral nervous system.

''Injury to the respiration apparatus—colds, bronchitis, lungs troubles. Injury to the cardiac vascular system—palpi-

tation irregular heart action slow to very fast and thin volume. Pains.

"Injury to the throat and digestive organs system. Constant angina, septic sore throat, dry,—bitter taste and must sip lubricating fluids, day and night. Esophagitis. Impaired normal functions of liver, intestines, lymph glands, and other glandular secretations. Phtisis. Injury to the limbs. Coxalgia. Sacroilliac pains and other injuries, illness and disabilities to various organs, tissues, cells, fluids and functions of the body, the personality and mind.'

"With all of them I must suffer and bear the agonies to the end of my shortened life period, days to sev. years.

"I no treatment is available to give relief and cure, and several physicians and hospitals have said there is no treatment and cure for these injuries and illness, so refused to give treatments, or helpful aid.

"Caused by and resulting from industrial injury and puncture stabs into the central nervous system canal and other membranes and draining cerebrospinal fluids from head, causing severe pains, sickness, paralysis near death. Negligence and repeated refusal to give treatments.

"Later, kidnapped, falsely imprisoned, severely tortured, overpowered and forced typhoid germs in my body. Bert Brock.''

In addition to this statement and the letter of Dr. Walker, a letter from the San Francisco County Hospital dated July 25, 1941, was also before Dr. Newman. It states that plaintiff was admitted to the San Francisco Hospital on July 14, 1940, and discharged on August 27, 1940, with the final diagnosis of "Psychoneurosis, mixed" and "improved." Under the heading "Remarks," the following statements were made: Patient was first admitted to the Isolation Hospital with a diagnosis of 'typhoid fever'; pending decision re his abnormal behavior. When he recovered he was admitted to the Psychiatric Hospital where he was for a week. At first he seemed quite definitely psychotic. He showed an agitated depression with some confusion and somatic delusions. The picture resembled Involutional Psychosis. At time of discharge to himself he was not psychotic. He displayed neurotic symptoms with considerable somatic preoccupation in the nature of hypochondriasis." The letter is signed, "L. M. Wilbor, Superintendent."

Dr. Newman testified as to the results of certain examinations which were made on Brock at the Stanford clinic. "The neurological examinations showed findings which were puzzling to us. He showed on at least two occasions a positive Romberg sign—that is, when he was requested to stand up with his feet together and shut his eyes, he would fall over. A normal person, with a normally functioning system, is able to stand up in that position. On several occasions also he showed on both sides a positive Babinski sign."

In response to the question, "what did you fear would happen if Mr. Brock were allowed to go free, retain his liberty?" posed by plaintiff's counsel, Dr. Newman replied: "I was afraid of two things: First and primarily, that if his mental condition was due to organic brain damage and brain tumor, there was certain a prominent possibility that the optimum time for treatment and possibility of the removal of such tumor would have passed before Mr. Brock would have been in a position where he could receive such treatment. In other words, I felt that delay in ascertaining the nature, the underlying condition responsible for his mental illness, might well be very dangerous to his possibility of recovery. Secondly, I knew that he had certain paranoid delusions, feelings of persecution to the extent that he felt that his life was, had been jeopardized on numerous occasions and that he had definite ideas as to under what circumstances that had occurred, the taking of the spinal puncture, being a lumbar puncture, and his alleged, by him, innoculation of typhoid in the San Francisco hospital, and his lack of cooperation and suspicion and hostility towards the doctors in the clinic at Stanford, were indicative of the persecutory trend. He felt himself to be in a very serious condition. He was despairing of his life. Knowing that he was suffering from mental disease, I felt that there was a reasonable possibility that he would seek redress for his persecution and knowing, again, that he had, was suffering from mental illness, I had no assurance that such redress would be of an orderly or lawful type and therefore I felt that he might seek redress of a violent nature against anyone who had been involved in those persecutory delusion circumstances."

It must here be said concerning Dr. Newman, what was said in *Jensen* v. *Leonard, supra,* 352-353, concerning Dr. Leonard in affirming a nonsuit: "We fail to find in the record before us sufficient evidence to have justified the jury in finding,

had the question been submitted to it, that respondent Dr. Leonard did not in fact believe that appellant was 'mentally ill,' as that term is defined by section 5040 of the Welfare and Institutions Code. Therefore, the question of his belief was properly determined by the court on the basis of what, under the circumstances, was sufficient to cause a reasonable person to entertain a suspicion of the mental illness of appellant. The burden was cast upon appellant of proving the negative fact of want of probable cause and the existence of malice. . . . Appellant's denial of the truth of statements made by respondent Hood to respondent Dr. Leonard did not create any conflict in the testimony that the latter had such statements before him at the time he interviewed appellant, and that he honestly believed that such statements as to appellant's condition were confirmed by her conduct toward him at the time he personally talked with her. We are, therefore, convinced that in the record before us there is an abundance of evidence, without substantial conflict, to justify a reasonable person, situated as respondent Dr. Leonard was, in assuming there was probable cause to believe that appellant was mentally ill. Such being the case, it was for the trial court to determine, as a matter of law, whether an inference of probable cause was warranted and whether respondent Dr. Leonard did or did not in fact believe that appellant was mentally ill.''

There is no merit in plaintiff's contention that Dr. Newman should have consulted Dr. Stockton or Dr. Edward Hause, who as an interne at the San Francisco Hospital on August 26, 1940, described plaintiff as ''psychoneurotic, it may be termed, but apparently adjusted to life and able to make his way for many years.'' Dr. Newman was not required to exhaust all sources of information bearing upon the facts which had come to his knowledge in order to have had probable cause for making the statements contained in his letter to Quinn. (*Richter* v. *Neilson,* 11 Cal.App.2d 503, 514-515 [54 P.2d 54] ; *Murdock* v. *Gerth,* 65 Cal.App.2d 170 [150 P.2d 489].)

Nor is there merit to plaintiff's contention that as a matter of law the evidence supports an inference ''from his own testimony that the doctor regarded plaintiff as a nuisance who had insufficient funds to become a patient in the hospital, who was too uncooperative to be a satisfactory out-patient,

and who could most easily be gotten rid of by commitment to a state institution." "Whether a particular inference can be drawn from certain evidence is a question of law." (*Blank* v. *Coffin, supra,* 461; *Hicks* v. *Reis, supra.*) Plaintiff's counsel questioned Dr. Newman concerning his statement in the letter to Quinn that plaintiff "is a menace to himself and society." He was reminded of a telephone conversation with plaintiff's counsel on October 25, 1946, and asked if he then gave as his reason for recommending commitment, "the fact he must have threatened suicide or threatened somebody at the time." Dr. Newman explained: "That was purely conjecture on my part. I didn't say that I remembered that he had. Here was something which was sprung on me over the phone after a period of five years . . ." Dr. Newman was further questioned as follows: "Q. Now, Doctor, calling your attention again to the conversation you had with me on October 25, 1946 at about 5:30 p.m., I will ask you if this conversation took place: I asked this question: 'Because I don't want to go into this too deep, but that intrigued me—this thing about being a menace to himself and society. A. Actually, he need not have been much of a menace to himself and society. That is the current phrase used by anybody we feel needs hospital care whether he wants it or not.' Q. Now, I ask you, if you told me that—— A. I still believe he must have been a menace to himself or society. The degree of menace, I think, must be left up to the doctor to judge. Q. Now, Doctor, what do you mean by the fact that this is a current phrase used by anybody you feel needs hospital care? A. Because he is a danger to himself, obviously the reason he needs hospital care, not merely to get a patient into the hospital who is perfectly willing to go, but one who needs medical care for his own safety and will not do so willingly; he therefore constitutes a menace to himself and, as such, I believe should be given such care against his will. Q. And that, in your opinion, explains the inconsistency that exists here, does it? A. I am not aware of the inconsistency, but it explains what you have said and what I said." Dr. Newman's good faith is evidenced in the following testimony: "Q. I see. Now, when Mr. Brock came to the Stanford hospital, he came as an out-patient, did he not? A. He did. Q. And that from all appearances, he had no money or funds with which to pay for proper medical care, is that right? A. I believe that is correct. Q. And because he was unable to

pay for treatment, you couldn't take him into the hospital as an in-patient, could you? A. We could have taken him into the hospital as an in-patient, yes, even though he had no money. There are funds available for such deserving cases. Q. Why wasn't it done in this instance? A. Because Mr. Brock in his contact with us in the out-patient clinic, made it obvious that he would not cooperate with the doctors if we did bring him in the hospital, and therefore it would be futile to use funds to have him in the hospital, when we could not enlist his cooperation for those things which we would bring him in the hospital for. Q. I see. So you felt, to get around that difficulty, it would be best to send him to a State mental institution? A. I felt that the State mental institution provided the one answer to his lack of cooperation which was endangering his life.''

It cannot be said in this case that ''there is affirmative evidence of the *actual belief* of the defendant sufficient to justify a conclusion that he did not in fact suspect the plaintiff'' of being in the condition described in his letter to Quinn. (*Franzen* v. *Shenk, supra,* 619.)

Other contentions presented by defendants need not be considered herein.

The appeal from the judgment entered on the verdict in favor of Matt Quinn and against plaintiff is affirmed. The appeal from the order granting the motions for judgment notwithstanding the verdict, being a nonappealable order, is dismissed. (Code Civ. Proc., § 963.) The judgment notwithstanding the verdict entered in favor of Southern Pacific Company, a corporation, and the Board of Trustees of Leland Stanford Junior University, a corporation, is affirmed.

Peters, P. J., and Bray, J., concurred.

A petition for a rehearing was denied July 15, 1948, and appellant's petition for a hearing by the Supreme Court was denied August 12, 1948. Carter, J., voted for a hearing.